STEPHENS, Judge.
 

 *456
 
 Plaintiff Glenn I. Hodge, Jr., appeals from the trial court's order granting summary judgment in favor of Defendant North Carolina Department of Transportation ("DOT") against his claim for violation of our State's Whistleblower Act. Hodge argues that he satisfied each element of his
 
 prima facie
 
 case by forecasting evidence that DOT took adverse employment actions against him in retaliation for engaging in activities protected by section 126-84 of our General Statutes, and that the trial court therefore erred in granting DOT's motion for summary judgment. We affirm the trial court's order.
 

 I. Factual Background and Procedural History
 

 Hodge first began working for the State of North Carolina in 1990 as an accountant in the Department of Human Resources, then transferred in January 1992 to work as an auditor for DOT. In May 1992, he was promoted to the position of Chief of DOT's Internal Audit Section ("IAS"). This is Hodge's fourth lawsuit against DOT to reach this Court.
 

 A. Hodge's prior lawsuits
 

 (1) Hodge I: Chief of IAS is not a policymaking exempt position
 

 In May of 1993, Hodge's position was designated by the Governor as policymaking exempt pursuant to N.C. Gen.Stat. § 126-5(d)(1).
 
 N.C. Dep't of Transp. v. Hodge,
 

 347 N.C. 602
 
 , 604,
 
 499 S.E.2d 187
 
 , 188 (1998) ("
 
 Hodge I
 
 "). Before his eventual termination in December of 1993, Hodge filed for a contested case hearing in the Office of Administrative Hearings ("OAH") challenging this designation.
 

 Id.
 

 The evidence presented during the OAH hearing demonstrated that DOT's IAS Chief had: (1) "considerable independence to direct and supervise audits inside the DOT"; (2) "supervisory authority within the section over other auditors' work and assignments"; and (3) responsibility for "consult[ing] with the heads of units being audited and with higher-ranking DOT officials and ma[king] recommendations for changes based on the result of audits."
 

 *457
 

 Id.
 
 at 604,
 
 499 S.E.2d at 189
 
 . However, "the evidence also showed that the Chief of [IAS] had no inherent or delegated authority to implement recommendations or order action based on audit findings."
 

 Id.
 

 Based on this evidence, the presiding ALJ issued a decision recommending that the designation of Hodge's position as policymaking exempt be reversed, based in part on a factual finding that:
 

 As Chief of [IAS], the Petitioner [Hodge] exercised broad flexibility and independence. In addition to supervising other auditors, he could decide who, what, when, how, and why to audit within the Department. While he could not order implementation of any recommendations, he was free to contact the State Bureau of Investigation concerning his findings.
 

 Id.
 

 After the State Personnel Commission adopted the ALJ's findings of fact and conclusions of law and ordered that the designation of the position as policymaking exempt be reversed, DOT appealed and the case eventually came before our Supreme Court, which ruled in Hodge's favor, holding that the position of DOT's Chief of IAS did not meet the statutory definition of policymaking provided in our General Statutes.
 
 Id.
 
 at 606-07,
 
 499 S.E.2d at 190
 
 . Specifically, the Court held that although Hodge "could recommend action on audit findings," he had "no authority to impose a final decision as to a settled course of action within ... DOT or any division of ... DOT, and his authority at the section level did not rise to the level of authority required by [ section] 126-5(b) to be considered policymaking."
 
 Id.
 
 at 606,
 
 499 S.E.2d at 190
 
 .
 

 (2) Hodge II: North Carolina Administrative Code requires reinstatement of dismissed employees to
 
 "
 
 same or similar
 
 "
 
 position
 

 As a result of our Supreme Court's decision in
 
 Hodge I,
 
 Hodge was awarded back
 
 *597
 
 pay and reinstated to employment in May 1998 as an Internal Auditor in DOT's Single Audit Compliance Unit at the same paygrade he held as IAS Chief.
 
 See
 

 Hodge v. N.C. Dep't of Transp.,
 

 137 N.C.App. 247
 
 , 249-50,
 
 528 S.E.2d 22
 
 , 25,
 
 reversed for the reasons stated in the dissent by
 

 352 N.C. 664
 
 ,
 
 535 S.E.2d 32
 
 (2000) ("
 
 Hodge II
 
 "). In July 1998, Hodge sought reinstatement to his previous position by filing a motion in Wake County Superior Court pursuant to 25 N.C.A.C. 1B.0428, which defines reinstatement as "the return to employment of a dismissed employee, in the same or similar position, at the same pay grade and step which the employee enjoyed prior to dismissal."
 
 Id.
 
 at 250,
 
 528 S.E.2d at 25
 
 . Hodge sought injunctive relief to compel DOT to reinstate him to the position of Chief of the Internal Audit Section and to bar DOT from filling the position with anyone other than himself.
 

 Id.
 

 *458
 
 After granting Hodge's motion for a preliminary injunction, the trial court granted summary judgment in Hodge's favor and DOT appealed to this Court, where the majority of a divided panel held the trial court had erred in granting Hodge's request for injunctive relief because Hodge had "failed to show that he would suffer irreparable harm absent issuance of the injunction."
 

 Id.
 

 However, after comparing the duties of his new, reinstated position as an Internal Auditor with the description provided in
 
 Hodge I
 
 of Hodge's responsibilities as Chief of IAS, the dissent concluded that Hodge's reinstatement did not comply with the express requirement in 25 N.C.A.C. 1B.0428 that Hodge be returned to the "same or similar position."
 
 Id.
 
 at 255-56,
 
 528 S.E.2d at 28-29
 
 (Walker, J., dissenting). On appeal, our Supreme Court reversed this Court's decision for the reasons stated in the dissent.
 
 Hodge v. N.C. Dep't of Transp.,
 

 352 N.C. 664
 
 ,
 
 535 S.E.2d 32
 
 (2000). Thereafter, Hodge was reinstated to the position of Chief of IAS, effective 30 October 2000.
 

 (3) Hodge III: Lawsuit for reinstatement is not protected activity under North Carolina's Whistleblower Act
 

 On 4 June 2003, Hodge filed another complaint against DOT in Wake County Superior Court, alleging this time that DOT had violated our State's Whistleblower Act, codified at section 126-84
 
 et seq.
 
 of our General Statutes, by unlawfully retaliating and discriminating against him due to his "reporting and litigating unlawful and improper actions[,]" specifically those at issue in
 
 Hodge I & Hodge II. Hodge v.
 

 N.C. Dep't of Transp.,
 

 175 N.C.App. 110
 
 , 112-13,
 
 622 S.E.2d 702
 
 , 704 (2005),
 
 disc. review denied,
 

 360 N.C. 533
 
 ,
 
 633 S.E.2d 816
 
 (2006) ("
 
 Hodge III
 
 "). Hodge's allegations included,
 
 inter alia,
 
 that after his 1998 reinstatement, DOT failed to provide him with "1) an adequate work space; 2) a computer with [updated] software; 3) training regarding either the procedures or computer equipment in the unit he was working in; and 4) an access number to the DOT database to gain information useful to complete assignments."
 
 Id.
 
 at 113,
 
 622 S.E.2d at 704
 
 . Hodge alleged further that although he did not receive any indication that his work performance was unsatisfactory until after he filed for the injunction at issue in
 
 Hodge II,
 
 he thereafter began to receive negative evaluations from his superiors, which he viewed as evidence of an elaborate scheme to manufacture his termination.
 
 See
 
 id.
 

 Hodge responded by refusing to complete any auditing assignments until after the alleged adverse conditions were eliminated.
 

 Id.
 

 For its part, DOT contended that Hodge was provided with "office space, computer equipment, and training comparable to others in [his] division"; that Hodge did not notify his superiors of the allegedly adverse conditions he faced until after his job performance was criticized; and
 
 *459
 
 that once notified, DOT worked to remedy the issues identified.
 

 Id.
 

 As a result of multiple poor performance evaluations and other written warnings spanning from fall 1998 into summer 2000, Hodge missed out on several increases to his salary and benefits, and he also alleged that after his original termination in 1993, DOT deliberately failed to increase the paygrade as scheduled for the Chief of the IAS in order to limit his back pay.
 
 Id.
 
 at 114,
 
 622 S.E.2d at 705
 
 . The trial court granted summary judgment in DOT's favor based in pertinent part on its conclusions that:
 

 First,
 
 the [c]ourt finds and concludes as a matter of law that, the institution of civil
 
 *598
 
 actions by State Employees to secure their employment rights allegedly violated by a state agency such as [DOT], or the institution of administrative proceedings in [OAH], are
 
 NOT
 
 acts which trigger the right to sue for retaliation under The Whistleblower Act, particularly [ section] 126-84....
 

 Second,
 
 assuming
 

 arguendo
 

 that The Whistleblower Act would be triggered by the filing of a civil action or an administrative proceeding relating to the terms and conditions of employment under the State Personnel Act, the record does not support any of [Hodge's] alleged claims for retaliation in violation of [ section] 126-84
 
 et seq
 
 ....
 

 Id.
 
 at 115,
 
 622 S.E.2d at 705
 
 (emphasis in original).
 

 Hodge appealed to this Court, arguing that DOT had violated the Whistleblower Act by retaliating against him for filing his lawsuit for reinstatement in
 
 Hodge II,
 
 but we rejected this argument and affirmed the trial court's decision.
 
 Id.
 
 at 117,
 
 622 S.E.2d at 707
 
 . In so holding, we examined the broad range of cases in which our State's appellate courts had previously found the protections afforded under the Whistleblower Act applicable-including cases involving State employees "who bring suit alleging sex discrimination, who allege retaliation after cooperating in investigations regarding misconduct by their superiors, and who allege police misconduct" as well as "alleged whistleblowing related to misappropriation of governmental resources"-and we recognized an important limitation on the scope of the Act's protections.
 
 Id.
 
 at 116-17,
 
 622 S.E.2d at 706
 
 (citations and internal quotation marks omitted). Specifically, as we explained, "[i]n all of these cases, the protected activities concerned reports of matters affecting general public policy," whereas Hodge's lawsuit "did not concern matters affecting general public policy" because "[his] 'report' was his 1998 lawsuit seeking reinstatement to his former position," the allegations of which "related only tangentially at best to a potential violation of the North Carolina
 
 *460
 
 Administrative Code."
 
 Id.
 
 at 117,
 
 622 S.E.2d at 707
 
 . Because we ultimately concluded that our General Assembly did not intend for the Whistleblower Act "to protect a State employee's right to institute a civil action concerning employee grievance matters," this Court "decline[d] to extend the definition of a protected activity [under the Whistleblower Act] to individual employment actions that do not implicate broader matters of public interest."
 

 Id.
 

 We also rejected Hodge's argument that the trial court erred in granting summary judgment to DOT when there was a genuine issue of material fact as to whether DOT's adverse actions toward him constituted intentional retaliation because, as we explained, "[a]ssuming
 
 arguendo
 
 that [Hodge] engaged in a protected activity, DOT presented legitimate, non-retaliatory reasons for all of the actions it has taken, and in his deposition testimony, [Hodge] acknowledged that there were legitimate explanations for the actions he alleged were retaliatory."
 
 Id.
 
 at 118,
 
 622 S.E.2d at 707
 
 (citation and internal quotation marks omitted).
 

 B. Hodge's present lawsuit
 

 Hodge continued to work as the Chief of IAS until 2008, when DOT implemented an agency-wide reorganization. Prior to the 2008 reorganization, DOT's auditing functions were divided between IAS, which had the "authority and responsibility to conduct information technology, investigative, and performance audits," and its External Audit Branch ("EAB"), which was divided into three units that focused on single audit compliance, railroad and utility audits, and consultant audits. Until the 2008 reorganization, IAS was housed separately from other DOT units in a leased office space in downtown Raleigh with free parking in an adjacent lot for Hodge, who was the only DOT supervisor in the building, and his small staff of auditors and support personnel. Hodge spent most of his time reviewing the work of his staff auditors, rather than conducting audits himself. Until May 2008, Hodge reported directly to DOT's Deputy Secretary of Administration and Business Development, Willie Riddick, who reported to DOT's Chief Deputy Secretary Dan DeVane, who reported in turn to DOT Secretary Lyndo Tippett. Riddick retired in May 2008 and was replaced as Deputy Secretary of Administration
 
 *599
 
 and Business Development by Anthony W. Roper. DOT's reporting chain of command remained otherwise unchanged.
 

 In September 2006, the Office of State Auditor Performance Report, "Internal Auditing in North Carolina Agencies and Institutions," found that IAS was experiencing significant difficulties with completing audits and producing reports, resulting in a lack of productivity, compromised independence due to reporting levels, and the need for auditing
 
 *461
 
 standards to be addressed in policy and procedures manuals. In 2007, DOT hired the global management consulting firm of McKinsey & Company to serve as an external consultant to " launch a three phase process to (1) diagnose the 'health' of the department, (2) design systems and processes to more efficiently support the organization, and (3) implement specific initiatives to create improvements in performance." In June 2007, McKinsey published a report recommending that DOT reorganize its structure to maximize collaboration and efficiency. Among numerous specific recommendations, the McKinsey report advocated for restructuring and unifying DOT's auditing functions into one unit, called the Office of Inspector General ("OIG"). Upon receiving the McKinsey report, DOT assembled a Transformation Management Team ("TMT") in order to "reassess DOT's vision, goals, and priorities, and to efficiently align its resources and activities with them."
 

 In August 2007, our General Assembly enacted the State Governmental Accountability and Internal Control Act ("Accountability Act") and the Internal Audit Act ("IAA"). The Accountability Act, codified in chapter 143D of our General Statutes, provides that "[t]he State Controller, in consultation with the State Auditor, shall establish comprehensive standards, policies, and procedures to ensure a strong and effective system of internal control within State government," while also requiring "[t]he management of each State agency [to] bear[ ] full responsibility for establishing and maintaining a proper system of internal control within that agency." N.C. Gen.Stat. §§ 143D-6, -7 (2015). The IAA, codified in section 143-745
 
 et seq.
 
 of our General Statutes, provides in pertinent part that each State agency "shall establish a program of internal auditing" that "[p]romotes an effective system of internal controls that safeguards public funds and assets and minimizes incidences of fraud, waste, and abuse" and ensures that agency operations are "in compliance with federal and state laws, regulations, and other requirements." N.C. Gen.Stat. § 143-746(a) (2015). As originally enacted, the IAA required that the head of each State agency "shall appoint a Director of Internal Auditing who shall report to the agency head and shall not report to any employee subordinate to the agency head."
 
 See
 

 2007 N.C. Sess. Laws 424
 
 , § 1; N.C. Gen.Stat. § 143-746(d) (2007).
 
 [1]
 
 In addition, the
 
 *462
 
 IAA established a Council of Internal Auditing-composed of the State Controller, the State Budget Officer, the Secretary of Administration, the Attorney General, the Secretary of Revenue, and the State Auditor-to "promulgate guidelines for the uniformity and quality of State agency internal audit activities."
 
 See
 

 2007 N.C. Sess. Laws 424
 
 , § 1; N.C. Gen.Stat. § 143-747(a), (c)(3) (2007).
 

 In December 2007, as TMT and several other DOT subcommittees tasked with implementing the structural changes recommended in the McKinsey Report continued their work, members of DOT's OIG Assessment Team consulted with counterparts from other states, including Florida's Inspector General Cecil Bragg and his staff. Members of the OIG Assessment Team later explained that they approached Bragg to learn more about Florida's "audit organization, independence, and structure" because Florida's DOT features an OIG "which is highly regarded in the auditing field." In February 2008, the
 
 *600
 
 OIG Assessment Team recommended that DOT adopt a model similar to the one used in Florida. On 12 March 2008, members of TMT attended a meeting of the Council of Internal Auditing and presented DOT's plan for creating an OIG with all audit functions reporting to an Inspector General who would act as the functional equivalent of the Director of Internal Auditing envisioned under the IAA. DOT's proposal won unanimous approval from the Council, which found that the restructuring met with both the intent and spirit of the IAA.
 

 Hodge would later claim that around this time, his supervisor, Riddick, specifically asked what he thought about DOT's pending reorganization and the creation of the OIG. According to Hodge, he told Riddick that he believed the proposed OIG plan was a direct violation of the IAA as well as our Supreme Court's rulings in
 
 Hodge I
 
 and
 
 II.
 
 During his deposition for the present lawsuit, Hodge testified that he believed Riddick had asked for his opinion because "he wanted to know for [DOT's] management and wanted to see a reaction as to how I would react to it." Hodge also testified that he did not know for a fact whether Riddick ever shared his views with anyone else at DOT, but Hodge assumed that he had based on his "gut feeling." Hodge also claimed that he had a similar conversation with Roper after Riddick retired, explaining that he believed Roper was trying to gauge whether Hodge would initiate litigation in response to DOT's reorganization because, in Hodge's view, DOT's management "may have been a little gun-shy from [my] prior cases."
 

 On 29 August 2008, DOT Secretary Tippett announced the creation of the OIG and named the former director of EAB, Bruce Dillard, as
 
 *463
 
 Inspector General. DOT's new OIG consisted of three separate units: the External Audit Unit, which oversees external and compliance audits; the Investigations Unit, which oversees investigations and bid monitoring; and the Financial and Organizational Performance Audit ("FOPA") Unit, which was comprised of three sub-units including the Internal Audit Unit, the Information Technology Audit Unit, and the Performance Audit Unit. As part of the reorganization, DOT relocated IAS from its old offices, which were under a lease that cost approximately $4,000.00 per month and was due to expire, to the second floor of the Transportation Building, which had been remodeled so that all DOT audit units could be centrally located under one roof. Hodge remained as Chief Internal Auditor of his sub-unit and reported to Acting FOPA Director Willard Young, who reported in turn to Inspector General Dillard, who reported directly to the Secretary, thus leaving the same number of links between Hodge and DOT's Secretary-two-as existed before the agency-wide reorganization.
 

 In 2008, pursuant to the requirements of the Accountability Act, the Office of the State Controller established a new internal control program called "EAGLE," which stands for "Enhancing Accountability in Government through Leadership and Education." DOT's OIG was tasked with creating templates and reports to test and assist in EAGLE's implementation. In October 2008, Inspector General Dillard assigned nine employees, including Hodge, to work on the EAGLE project. Hodge was the only DOT employee who failed to turn in his assignment on time. Throughout November and December, Hodge requested and received multiple extensions to complete his EAGLE assignment, ignored instructions from his superiors, Dillard and Young, to initially prioritize and then work exclusively on his EAGLE assignment, and repeatedly missed deadlines for completing the assignment. On 16 December 2008, Dillard and Young met with Hodge, issued him a written warning for unsatisfactory job performance due to his failure to complete a critical work assignment in a satisfactory and timely manner, and cautioned Hodge that if his performance did not improve immediately, he would be subject to further disciplinary action up to and including dismissal.
 

 On 22 December 2008, Hodge filed a complaint against DOT in Wake County Superior Court alleging that DOT had taken adverse action against him in retaliation for engaging in activities protected by our State's Whistleblower Act. Specifically, Hodge alleged that he had "reported on multiple occasions" during
 
 *601
 
 2008 that DOT had violated the IAA's requirement that the head of each State agency appoint a Director of Internal Auditing "who shall report to the agency head and shall not
 
 *464
 
 report to any employee subordinate to the agency level" because Hodge, as Chief of IAS, did not report directly to DOT's Secretary.
 
 [2]
 
 Hodge alleged further that his superiors at DOT, including Dillard and Young, had illegally retaliated against him for making these reports by reducing his position within DOT and further distancing him in the reporting chain of command from DOT's Secretary; discriminating against Hodge and other members of IAS regarding pay raises; and taking disciplinary action against Hodge "that was not motivated by legitimate disciplinary concerns but rather out of a desire to retaliate against and harass [Hodge] and harm [Hodge's] career with DOT."
 
 [3]
 

 Hodge remained employed at DOT through the first half of 2009 but, despite regular meetings during which Willard and Young urged him to complete his 2008 EAGLE assignment and additional EAGLE-related follow-up assignments, Hodge continued his pattern of failing to submit completed work assignments after requesting and receiving multiple extensions on deadlines. On 4 June 2009, Hodge received a "Does Not Meet Expectations" rating from Young on his annual performance evaluation. On 17 June 2009, Hodge was issued a Corrective Action Plan to remedy his performance deficiencies. However, during a follow-up meeting on 26 June 2009, Hodge informed Young that "on the advice of his lawyer" he would not be completing any of his EAGLE assignments and stated that he believed Dillard and others at DOT were out to get him because of his previous lawsuits against the agency. When Hodge was notified during a meeting with Dillard on 30 June 2009 that any further refusals to complete his work assignments would be considered insubordination, and thus potentially grounds for termination, Hodge confirmed that he would continue to refuse to complete his work assignments. Hodge's only comment during a pre-disciplinary conference held on 8 July 2009 was that he believed that DOT's newly created OIG was illegal and that any disciplinary actions taken against him by Dillard and Young would likewise be illegal. Hodge was notified by letter
 
 *465
 
 dated 10 July 2009 that he would be terminated from DOT's employment as a result of his insubordination.
 

 On 22 July 2009, Hodge filed a written request with DOT's Human Resources Division to appeal his termination, arguing that it had been without just cause. However, because Hodge thereafter failed to comply with the time limits and filing requirements of DOT's employee grievance policy and procedures, his case was administratively closed. On 19 January 2010, Hodge filed a petition for a contested case hearing in the OAH alleging he had been terminated without just cause. At some point thereafter, Hodge attempted to add a claim for retaliation in violation of the Whistleblower Act, and DOT filed a motion to dismiss Hodge's claims for lack of subject matter jurisdiction. On 14 June 2010, the presiding ALJ issued an Amended Final Decision, which concluded that OAH lacked subject matter jurisdiction to consider either of Hodge's claims because-given his noncompliance with DOT's filing requirements and the fact that he failed to file his claim under the Whistleblower Act within 30 days of his termination as required by 25 N.C.A.C. 1B.0350 -Hodge failed to timely exhaust his administrative remedies. Consequently, the ALJ dismissed Hodge's claims with prejudice. On 25 June 2010,
 
 *602
 
 Hodge filed a petition for judicial review in Wake County Superior Court. On 31 October 2010, after a hearing, Superior Court Judge Paul C. Ridgeway entered an order affirming the ALJ's decision in favor of DOT, and Hodge did not pursue any appeal to this Court.
 

 Meanwhile, on 25 October 2010, Hodge filed a voluntary dismissal of his pending Whistleblower Act claim in Wake County Superior Court. Hodge refiled a substantially similar complaint on 16 September 2011. On 13 June 2012, DOT filed an answer in which it denied Hodge's allegations of retaliation in violation of the Whistleblower Act, stated that any adverse actions taken against Hodge were for legitimate, non-retaliatory reasons, and raised the defense of lack of subject matter jurisdiction. On 23 December 2014, DOT filed a motion for summary judgment. In support of its motion, DOT provided affidavits from:
 

 • Roberto Canales, who served as a TMT Project Leader in planning DOT's 2008 reorganization, described the process that led to the creation of the OIG, and explained how the reorganization had nothing to do with Hodge or his prior litigation against DOT;
 

 • Riddick, who served as Hodge's superior until 1 May 2008 and who swore that he did not recall Hodge ever discussing his opinions about the IAA or the OIG and that even if they had discussed these matters, he would not have communicated Hodge's
 
 *466
 
 objections to others in DOT's chain of command because "[t]he transformation recommendations and subsequent restructuring [were] a DOT management decision and did not involve [Hodge]";
 

 • Roper, who served as Hodge's superior from May 2008 until the implementation of DOT's OIG several months later; he swore that he remembered Hodge approaching him at one point and stating his belief that OIG was created to "get back at him" for his previous cases against DOT but Roper "saw no reason to repeat [Hodge's] statement because the restructuring within DOT was an extensive and well-researched management decision and was not for the purpose of retaliating against [Hodge]"; he also recalled Hodge complaining on one occasion that there had been a pay disparity between IAS and EAB since his reinstatement in 1998, to which Roper responded by explaining that the two sections "were distinct business units with separate auditing functions" and that a review of employee salaries was not warranted;
 

 • Dillard and Young, who both swore that they were unaware of Hodge's opinions regarding the IAA or DOT's creation of the OIG until counsel from the State Attorney General's office informed them in January 2009 that Hodge had filed a whistleblower action against them, and that the disciplinary actions taken against Hodge were solely the result of his insubordinate refusal to complete his EAGLE assignments.
 

 In opposition to DOT's motion for summary judgment, Hodge submitted an affidavit specifying that his reports "were made to [Riddick and Roper] .... regarding the establishment of the DOT [OIG] together with another two layers of management between my position as Chief Internal Auditor, or Director of [IAS]. This, as noted, was a direct violation of the [IAA] which requires that I as Director of Internal Auditing report directly to the [DOT] Secretary." Hodge characterized the creation of OIG as a reduction in his position, "an alteration of the terms, conditions, and/or privileges of [his] employment" and "a
 
 de facto
 
 demotion." Hodge also stated that any claims by DOT officials that they did not remember or were unaware of Hodge's report were false, as were any claims that the adverse actions taken against Hodge were anything other than "successful efforts to engineer and obtain [his] dismissal from DOT" in retaliation for his report. Regarding the written warning he received in December 2008 for failing to complete his EAGLE assignment, Hodge averred that he "had repeatedly protested this assignment because it was work properly assigned to a staff auditor, a fact of which Dillard was aware" and further contended that Dillard "had no legal
 
 *467
 
 authority to either act as my
 
 *603
 
 supervisor or to assign me the duties of a staff auditor." To support this assertion, Hodge noted that:
 

 In previous litigation with DOT involving my position, the [North Carolina] Supreme Court has established the duties and responsibilities of the Director or Chief of Internal Audit for DOT. As the Supreme Court stated in the relevant opinion, "As Chief of [IAS], [I] exercised broad flexibility and independence. In addition to supervising other auditors, [I] could decide who, what, when, how, and why to audit within [DOT]."
 

 This additionally constituted, I contend, a violation of the [IAA]. Especially given that my specific duties were established by the Supreme Court, DOT cannot
 
 de facto
 
 remove me as Chief Auditor under the guise of a "reorganization" or other such action.
 

 At the conclusion of a hearing held on DOT's motion for summary judgment on 6 February 2015, the trial court announced that it would grant the motion and entered a written order to that effect the same day. Hodge gave notice of appeal to this Court on 27 February 2015.
 

 II. Analysis
 

 Hodge argues that the trial court erred in granting DOT's motion for summary judgment. We disagree.
 

 A. Jurisdiction
 

 As a preliminary matter, we first address DOT's argument that Hodge's whistleblower claim is barred by lack of subject matter jurisdiction as a result of the OAH proceedings below. Specifically, DOT relies on our decision in
 
 Swain v. Elfland,
 

 145 N.C.App. 383
 
 ,
 
 550 S.E.2d 530
 
 ,
 
 cert. denied,
 

 354 N.C. 228
 
 ,
 
 554 S.E.2d 832
 
 (2001), for the proposition that although our General Statutes provide two possible avenues to redress violations of the Whistleblower Act-with jurisdiction in the OAH as provided by section 126-34.02(b)(6), or in superior court as provided by section 12686-a plaintiff "may choose to pursue a [w]histleblower claim in either forum, but not both" in order to avoid "the possibility that different forums would reach opposite decisions, as well as engender needless litigation in violation of the principles of collateral estoppel."
 
 Id.
 
 at 389,
 
 550 S.E.2d at 535
 
 . Thus, in DOT's view, the fact that the ALJ's Amended Final Decision in this matter dismissed Hodge's claims for both termination without just cause and retaliation in violation of the Whistleblower Act should prohibit Hodge's current lawsuit.
 

 *468
 
 Our Supreme Court rejected a similar argument in
 
 Newberne v. Dep't of Crime Control & Pub. Safety,
 

 359 N.C. 782
 
 , 797-98,
 
 618 S.E.2d 201
 
 , 211-13 (2005). There, the defendant State agency contended that the plaintiff's lawsuit in superior court should have been barred because he had already raised his whistleblower claim before the OAH.
 
 Id.
 
 at 797,
 
 618 S.E.2d at 211
 
 . However, the only evidence in the record regarding the OAH proceedings was a copy of the plaintiff's petition for a contested case hearing, on which the plaintiff had checked two pre-printed boxes to indicate that the grounds for his request were (a) that he was discharged without cause and (b) that his termination was due to "discrimination and/or retaliation for opposition to alleged discrimination" on the basis of race.
 
 Id.
 
 at 798-99,
 
 618 S.E.2d at 212
 
 . The only other pertinent information on the plaintiff's petition was his brief statement that he "was dismissed as a Highway Patrolman without just cause based upon a complete misinterpretation of [his] actions and statements re: a case of excessive force."
 
 Id.
 
 at 799,
 
 618 S.E.2d at 212
 
 . Our Supreme Court noted that although the plaintiff's statement was "not inconsistent with the factual allegations in [the plaintiff's] subsequently filed whistleblower claim, the language in his petition in no way states a claim under the Whistleblower Act."
 
 Id.
 
 at 799,
 
 618 S.E.2d at 213
 
 . Given the two grounds clearly indicated for his requested OAH hearing and the conspicuous absence of any allegation in his petition that his dismissal was the result of retaliation in violation of the Whistleblower Act, the Court held that "the doctrine of administrative exhaustion does not prevent [the] plaintiff from filing a whistleblower claim in superior court."
 

 Id.
 

 In the present case, the record is similarly sparse when it comes to what the parties actually argued at the OAH level. However,
 
 *604
 
 the only basis stated on Hodge's petition for a contested case hearing is that he was discharged without just cause. DOT emphasizes the fact that the ALJ's Amended Final Order indicates Hodge subsequently attempted to raise claims for discrimination and retaliation before the OAH. Yet the Amended Final Order also makes clear that the ALJ dismissed those claims for lack of subject matter jurisdiction because Hodge failed to timely raise them within 30 days as required by the North Carolina Administrative Code. Moreover, by DOT's logic, our holding in
 
 Swain
 
 would have blocked Hodge from ever raising such claims before the OAH because he had already filed a lawsuit in superior court in December 2008, more than six months before he ever petitioned for administrative review of his termination in the OAH in July 2009. Although Hodge eventually took a voluntary dismissal of his superior court action in October 2010, he did not do so until after his claims before the OAH
 
 *469
 
 were dismissed with prejudice. Thus, despite DOT's claims to the contrary, because the OAH never acquired subject matter jurisdiction over Hodge's claim that he suffered retaliation after engaging in activity protected under the Whistleblower Act, we conclude that here, as in
 
 Newberne,
 
 the doctrine of administrative exhaustion does not bar Hodge's current lawsuit.
 

 B. Hodge's appeal
 

 Hodge argues that he was disciplined and eventually terminated from employment with DOT in retaliation for reporting his belief that the 2008 reorganization and creation of the OIG violated the IAA and our Supreme Court's holdings in
 
 Hodge I
 
 &
 
 II.
 
 Hodge argues further that the trial court erred by granting DOT's motion for summary judgment because he established each element of his
 
 prima facie
 
 claim under the Whistleblower Act. However, we conclude that irrespective of whether Hodge satisfied his
 
 prima facie
 
 burden, this argument fails.
 

 As our Supreme Court has explained,
 

 [s]ummary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law. The trial court may not resolve issues of fact and must deny the motion if there is a genuine issue as to any material fact. Moreover, all inferences of fact must be drawn against the movant and in favor of the party opposing the motion. The standard of review for summary judgment is
 
 de novo.
 

 Forbis v. Neal,
 

 361 N.C. 519
 
 , 523-24,
 
 649 S.E.2d 382
 
 , 385 (2007) (citations, internal quotation marks, and ellipsis omitted).
 

 North Carolina's Whistleblower Act, codified at section 126-84
 
 et seq.
 
 of our General Statutes, provides that:
 

 State employees shall be encouraged to report verbally or in writing to their supervisor, department head, or other appropriate authority, evidence of activity by a State agency or State employee constituting:
 

 (1) A violation of State or federal law, rule or regulation;
 

 (2) Fraud;
 

 (3) Misappropriation of State resources;
 

 *470
 
 (4) Substantial and specific danger to the public health and safety; or
 

 (5) Gross mismanagement, a gross waste of monies, or gross abuse of authority.
 

 N.C. Gen.Stat. § 126-84(a) (2015). Section 126-85 states that
 

 [n]o head of any State department, agency or institution or other State employee exercising supervisory authority shall discharge, threaten or otherwise discriminate against a State employee regarding the State employee's compensation, terms, conditions, location, or privileges of employment because the State employee, or a person acting on behalf of the employee, reports or is about to report, verbally or in writing, any activity described in [ section] 126-84, unless the State employee knows or has reason to believe that the report is inaccurate.
 

 N.C. Gen.Stat. § 126-85 (2015). In order to succeed on a claim for retaliatory termination,
 

 the Act requires plaintiffs to prove, by a preponderance of the evidence, the following
 
 *605
 
 three essential elements: (1) that the plaintiff engaged in a protected activity,
 
 [4]
 
 (2) that the defendant took adverse action against the plaintiff in his or her employment, and (3) that there is a causal connection between the protected activity and the adverse action taken against the plaintiff.
 

 *471
 

 Newberne,
 

 359 N.C. at 788
 
 ,
 
 618 S.E.2d at 206
 
 . Regarding the third element for establishing a plaintiff's
 
 prima facie
 
 case under the Act,
 

 [t]here are at least three distinct ways for a plaintiff to establish a causal connection between the protected activity and the adverse employment action under the Whistleblower Act. First, a plaintiff may rely on the employer's admission that it took adverse action against the plaintiff solely because of the plaintiff's protected activity....
 

 Second, a plaintiff may seek to establish by circumstantial evidence that the adverse employment action was retaliatory and that the employer's proffered explanation for the action was pretextual. Cases in this category are commonly referred to as pretext cases....
 

 ....
 

 Third, when the employer claims to have had a good reason for taking the adverse action but the employee has direct evidence of a retaliatory motive, a plaintiff may seek to prove that, even if a legitimate basis for discipline existed, unlawful retaliation was nonetheless a substantial causative factor for the adverse action taken.
 

 Id.
 
 at 790-91,
 
 618 S.E.2d at 207-08
 
 (citations, internal quotation marks, and certain brackets omitted). Although he does not so state in his complaint, Hodge contends in his brief to this Court that the third element of his
 
 prima facie
 
 case can be established through circumstantial evidence.
 
 [5]
 
 Therefore, his
 
 *606
 
 claim falls within the second category described
 
 *472
 
 in
 
 Newberne,
 
 which means that to prevail, he must show that DOT's proffered reasons for taking adverse actions against him were merely pretextual. As our Supreme Court explained in
 
 Newberne,
 

 [pretext cases] are governed by the burden-shifting proof scheme developed by the United States Supreme Court in
 
 McDonnell Douglas Corp. v. Green
 
 and
 
 Texas Department of Community Affairs v. Burdine.
 

 Under the
 
 McDonnell Douglas/Burdine
 
 proof scheme, once a plaintiff establishes a
 
 prima facie
 
 case of unlawful retaliation, the burden shifts to the defendant to articulate a lawful reason for the employment action at issue. If the defendant meets this burden of production, the burden shifts back to the plaintiff to demonstrate that the defendant's proffered explanation is pretextual. The ultimate burden of persuasion rests at all times with the plaintiff.
 

 Id.
 

 (citations omitted).
 

 As noted
 
 supra,
 
 in the present case, Hodge argues that the trial court's order granting summary judgment in favor of DOT must be reversed because he has established each element of his
 
 prima facie
 
 case. However, this Court recently rejected a virtually identical argument in
 
 Manickavasagar v. N.C. Dep't of Pub. Safety,
 
 --- N.C.App. ----,
 
 767 S.E.2d 652
 
 (2014), where we held that the trial court did not err in granting the defendant State agency's motion for summary judgment against the plaintiff's claim under the Whistleblower Act that he had been terminated in retaliation for reporting fraud, misappropriation of
 
 *473
 
 State resources, and gross mismanagement.
 
 See
 

 id.
 

 at ----,
 
 767 S.E.2d at 660
 
 . Although the plaintiff in
 
 Manickavasagar
 
 insisted this Court should reverse the trial court's decision because he had satisfied each element of his
 
 prima facie
 
 case, we explained that
 

 [e]ven if we were to assume
 
 arguendo
 
 that [the p]laintiff has established a
 
 prima facie
 
 claim, his suit against [the d]efendants was still properly disposed of through summary judgment. [The d]efendants have articulated some legitimate, non-retaliatory reasons for terminating [the p]laintiff's employment ..., specifically his reported clashes with ... personnel and ongoing refusal to follow ... protocol. Therefore, under the
 
 McDonnell Douglas/Burdine
 
 burden-shifting proof scheme, in order to survive summary judgment, [the p]laintiff would have to raise a factual issue regarding whether these proffered reasons for firing [the p]laintiff were pretextual. To raise a factual issue regarding pretext, the plaintiff's evidence must go beyond that which was necessary to make a
 
 prima facie
 
 showing by pointing to specific, non-speculative facts which discredit the defendant's non-retaliatory motive.
 

 Id.
 

 at ----,
 
 767 S.E.2d at 659
 
 (citation and internal quotation marks omitted). Because the plaintiff failed to provide any "express argument that the [d]efendants' stated reasons for firing him were pretextual," we affirmed the trial court's decision.
 

 Id.
 

 Similarly here, even assuming
 
 arguendo
 
 that Hodge has satisfied his
 
 prima facie
 
 burden,
 
 Newberne
 
 and
 
 Manickavasagar
 
 make clear that Hodge cannot prevail unless he is able to demonstrate that DOT's stated reasons for taking adverse employment actions against him were merely a pretext for unlawful retaliation. Setting aside the substantive flaws in Hodge's broader legal argument
 
 [6]
 
 to focus on the second prong of the
 
 *474
 

 *607
 
 burden-shifting approach our Supreme Court outlined in
 
 Newberne,
 
 it is clear from the record before us that throughout this litigation DOT has articulated several legitimate, non-retaliatory reasons for disciplining and eventually terminating Hodge-specifically, Hodge's prolonged, consistent, and extensively documented pattern of insubordinately refusing to complete his work assignments after DOT's 2008 reorganization. Thus, as we explained in
 
 Manickavasagar,
 
 "under the
 
 McDonnell Douglas/Burdine
 
 burden-shifting proof scheme, in order to survive summary judgment, [Hodge] would have to raise a factual issue regarding whether these proffered reasons for firing [him] were pretextual," which means Hodge must produce evidence "beyond that which was necessary to make a
 
 prima facie
 
 showing by pointing to specific, non-speculative facts which discredit [DOT's] non-retaliatory motive."
 

 Id.
 

 at ----,
 
 767 S.E.2d at 659
 
 (citation omitted).
 

 On this point, Hodge makes no express argument whatsoever, and our review of the record reveals no competent evidence to support any finding of pretext. Indeed, Hodge's deposition testimony and affidavit in opposition to summary judgment provide little more than conclusory allegations, improbable inferences, and unsupported speculation, rather than the sort of specific, non-speculative facts sufficient to show that the reasons DOT articulated for disciplining and terminating him from employment were merely pretextual. Given Hodge's failure to articulate any argument on the third prong of the burden-shifting analysis-and, in light of our Supreme Court's admonition that "[i]t is not the role of the appellate courts ... to create an appeal for an appellant,"
 
 Viar v. N.C. Dept. of Transp.,
 

 359 N.C. 400
 
 , 402,
 
 610 S.E.2d 360
 
 , 361,
 
 reh'g denied,
 

 359 N.C. 643
 
 ,
 
 617 S.E.2d 662
 
 (2005) -we hold that the trial court did not err in granting DOT's motion for summary judgment. Accordingly, the trial court's order is
 

 AFFIRMED.
 

 Judges HUNTER, JR., and INMAN concur.
 

 [1]
 

 This subsection of the Act has since been amended, and now provides that, "The agency head shall appoint a Director of Internal Auditing who shall report to, as designated by the agency head, (i) the agency head, (ii) the chief deputy or chief administrative assistant, or (iii) the agency governing board, or subcommittee thereof, if such a governing board exists. The Director of Internal Auditing shall be organizationally situated to avoid impairments to independence as defined in the auditing standards referenced in subsection (b) of this section." N.C. Gen.Stat. § 143-746(d) (2015).
 

 [2]
 

 When asked to elaborate on this point during his deposition, Hodge testified that he believed he should have been named Director of Internal Auditing under the IAA because "[t]hat was my job title [in IAS before the 2008 reorganization]. On top of that, I spent thousands of dollars and [a] couple of trips to the Supreme Court to prove that."
 

 [3]
 

 These allegations come from the complaint Hodge refiled in September 2011 after voluntarily dismissing his original complaint in 2010. The original complaint does not appear in the record, but there is no dispute that Hodge's refiled 2011 complaint was substantially similar to his original 2008 complaint. Indeed, Hodge's deposition and the affidavits filed by DOT in support of its motion for summary judgment in the present lawsuit were initially collected during discovery for Hodge's original complaint prior to its voluntary dismissal.
 

 [4]
 

 DOT offers several arguments for why Hodge cannot satisfy the first element of his
 
 prima facie
 
 case, but none of them is availing. DOT argues that Hodge's report that the creation of OIG violated the IAA and our Supreme Court's holdings in
 
 Hodge I
 
 &
 
 II
 
 only amounts to a personal grievance relating to the terms and conditions of Hodge's own employment, and thus does not satisfy the first element of his
 
 prima facie
 
 case in light of this Court's holding in
 
 Hodge III
 
 that the scope of activities protected under the Whistleblower Act extends only to "matters affecting general public policy."
 
 175 N.C.App. at 117
 
 ,
 
 622 S.E.2d at 707
 
 . While it is undoubtedly true that Hodge's current lawsuit emerges from the context of over a decade of acrimonious litigation between the parties over his employment at DOT, this argument misapprehends the procedural posture and holding of
 
 Hodge III.
 
 Our holding there was based not on the fact that Hodge's allegations of retaliation revolved around an employment-related grievance, but instead on the fact that, by his own admission, the only relevant, allegedly protected activity Hodge engaged in was the filing of his lawsuit in
 
 Hodge II
 
 for reinstatement to his previous position, which "related only tangentially at best to a potential violation of the North Carolina Administrative Code."
 

 Id.
 

 Here, by contrast, Hodge has alleged that DOT sought to circumvent State laws and court rulings designed to safeguard public funds and minimize fraud, waste, and abuse in State government. We disagree that such allegations do not address matters affecting general public policy. We likewise decline to hold that Hodge cannot satisfy the first element of his
 
 prima facie
 
 case based on DOT's argument that Hodge was wholly mistaken to conclude any violation of the IAA or any other law had occurred. This argument fails because the relevant inquiry at this stage is not the substantive accuracy of the violations a plaintiff alleges, but instead whether it can be shown that adverse employment action was taken against him in retaliation for his allegations.
 
 See, e.g.,
 

 Newberne,
 

 359 N.C. at 795-96
 
 ,
 
 618 S.E.2d at 210-11
 
 .
 

 [5]
 

 Specifically, Hodge relies on this Court's prior holding in
 
 Fatta v. M & M Props. Mgmt., Inc.,
 

 221 N.C.App. 369
 
 , 373,
 
 727 S.E.2d 595
 
 , 599,
 
 disc. review denied,
 

 366 N.C. 407
 
 ,
 
 735 S.E.2d 182
 
 (2012),
 
 and
 

 366 N.C. 601
 
 ,
 
 743 S.E.2d 182
 
 (2013), to support his assertion that "[i]t is solid law that temporal causality between the protected activity and the adverse action, standing alone, is sufficient to satisfy the third [element]" of his
 
 prima facie
 
 burden. Although
 
 Fatta
 
 involved an alleged violation of the North Carolina Retaliatory Employment Discrimination Act, codified at section 95-241(a) of our General Statutes, rather than a claim under the Whistleblower Act, our State's appellate courts have consistently applied the same burden-shifting model derived from federal law for claims arising under both statutes.
 
 See
 

 id.
 
 at 371-72,
 
 727 S.E.2d at 599
 
 . The evidence of temporal proximity found sufficient to satisfy the plaintiff's
 
 prima facie
 
 burden on the element of causation in
 
 Fatta
 
 was that "[the] plaintiff demonstrated that he was terminated from employment five days after informing [the] defendant of his work-related injury and of his intention to file a worker's compensation claim."
 
 Id.
 
 at 373,
 
 727 S.E.2d at 599
 
 . Here, by contrast, Hodge purports to have reported a violation of State law a minimum of several months before any adverse actions were ever taken against him. However, we need not determine whether Hodge's argument extends beyond the point of what qualifies as "temporally proximate," because
 
 Fatta
 
 also makes clear that the burden-shifting inquiry does not end merely because a plaintiff has satisfied his
 
 prima facie
 
 case. Indeed, in
 
 Fatta,
 
 this Court ultimately upheld the trial court's decision granting summary judgment in favor of the defendant-employer based on our conclusion that the plaintiff failed to offer any evidence other than "conclusory allegations, improbable inferences and unsupported speculation" to show that the legitimate nondiscriminatory reasons offered by the defendant-employer for the adverse actions taken against the plaintiff were merely pretextual.
 
 See
 

 id.
 
 at 375,
 
 727 S.E.2d at 601
 
 (citation omitted).
 

 [6]
 

 Apart from Hodge's own self-serving speculation, our review of the record discloses no evidence whatsoever to support the premise implicit in his argument that DOT's 2008 reorganization and creation of the OIG were engineered primarily as an attempt to circumvent our Supreme Court's holdings in
 
 Hodge I
 
 &
 
 II
 
 in order to "get back at" Hodge. Indeed, the evidence in the record indicates that one of the motivating factors behind DOT's decision to hire McKinsey was the deficient performance of Hodge's own IAS unit as described by the State Auditor. Moreover, we note that the alleged violation of the IAA that Hodge complains of was unanimously approved by the Council of Internal Auditing created by the IAA's enactment to enforce its provisions, and-despite Hodge's protestations to the contrary-did not have any effect on Hodge's reporting level, insofar as both before and after DOT's 2008 reorganization and creation of the OIG, Hodge remained two levels removed from the agency Secretary. Hodge's complaint that the IAA required that he personally should have been named DOT's Director of Internal Auditing is similarly misplaced, given that it depends upon accepting Hodge's related and wholly unpersuasive argument that he can never be removed from his position as Chief of IAS, and DOT is forever prohibited from reorganizing its auditing functions in a way that would do so, simply because our Supreme Court previously concluded that such position cannot properly be classified as policymaking exempt and that the North Carolina Administrative Code requires that a State employee who has been improperly discharged and then reinstated must be returned to the "same or similar" position.